San Ysidro, Modelo, New Mexico versus CB Brand Strategies, 23-810. San Ysidro, Modelo, New Mexico versus CB Brand Strategies, 23-810.  You've lost your entire audience, almost. Not a bureaucrat. Okay, please proceed. Good afternoon. Good afternoon, Your Honors. The hard seltzers at issue here are clear, fruity, carbonated drinks. They're not malt beverages or beer on an ordinary understanding of those terms. To be a malt beverage or a version of a malt beverage, a drink has to have malt. To be a beer or a version of a beer, a drink has to be fermented with malt and flavored with hops. That's not my say so. It's how countless Americans use those words every day, everywhere from bars to grocery stores, which is why every dictionary reflects that common usage. To be clear, Constellation can still make all the non-malt drinks it wants. It just can't put Modelo's label on them. Modelo and Constellation never bargained for that when Modelo divested its U.S. beer business. If the panel has questions, I'd welcome them, but I'm happy to dive right into the contractual language. It has a set of terms, malt beverages, beer, and versions of those. We say malt beverages have to have malt in them. If we're right about that, and there's nothing ambiguous about that phrase, then at a minimum under Moore's decision. The agreement gives a definition for beer, and it doesn't exclude. It says malt beverages, but it doesn't say only malt beverages. It says a number of things, and it allows for new development and experimentation, development of new products. And it talks about fermentation. It doesn't say what has to be the fermenting mechanism. So why is it that everything has to be malt-based? So, Judge Wesley, it has large B, beer, is the term in the contract. And then as you said, it has beer, malt beverages, and versions of combinations of those. So I want to separate out the malt beverages and beer from the versions. Because all those terms got put to the jury. Its verdict could have rested on any of them. If we're right about malt versions or beer, then under Moore's diesel, at a minimum we get a new trial. Because there were unambiguous terms that were put to the jury that could have been the basis for its verdict. But I don't want to convince you that we just- Well, apparently I would suggest to you that Judge Kaplan thought there was an ambiguity, which is why he reacted the way he did with regard to the various motions and ultimately put the matter to the jury. And his specific instruction said to the jury, read what the contract says. And you've heard – and take the language because he uses the zebra definition. It says, large C, zebra equals three pieces of furniture. And that's to be your understanding of what a zebra is. You may have a different understanding of it, but this is how the parties define it. Your goal is to apply the party's intent. You're to glean from the language of the contract, the terms it employs, and then to see if you can understand the terms of the employment. That sounds like basic contract law to me. And you say that there is an ambiguity. And yet at the same time, you say there's plain language. So I don't understand where it comes out. I'm sorry. I take it back. You don't say there's an ambiguity. It's just plain language. All right. You are right. Judge Kaplan said it was ambiguous. But again, I want to separate out what could have been ambiguous. Malt beverages went to the jury. Shouldn't have. That's clear. Beer, we think, has an ordinary meaning. And then as you say, there is language of aversion. Sure. Beer has an ordinary meaning in Geneseo, New York, where I live. But you folks agree that Zima is covered by this agreement. Zima is not beer in Geneseo. I guarantee you. And so the simple fact of the matter is that the common usage of the word beer is separated from this agreement. This agreement has an understanding of beer that is contrary to what a layperson, man or woman, would think of as beer. And so be it. You're big boys and girls. You can do that. So, Judge Wesley, I want to separate a couple of different things. Zima, I didn't realize until this case, Zima has malt in it. It's fruity. It's clear. It is. And it bubbles. It is, but it's a malt. It doesn't look like beer to me. But it is a malt beverage. So when the contract says beer, it has a set of undefined terms. You two have been driving me and my clerks crazy for three weeks with this case, as have the other chambers. Only lawyers can argue about what is the meaning of beer. But you had an agreement, and the jury heard a whole lot of evidence, and then the court said to the jury, take the terms as they've been given. You didn't even object when the court – you don't argue that it was fair for the court not to admit the definitions of beer, the dictionary definitions that you wanted. You didn't even accept that. And when the court wanted to read the dictionary definition or – excuse me, when the court wanted to instruct the jury to disregard the dictionary definition that had gotten in, you agreed with it. So how is it that you come here and tell us, then, do you want to use the ordinary meaning of the word beer? I don't understand that position. Judge Wesley, we tried throughout the case to use the ordinary meaning of beer. We asked for an ordinary meaning instruction. Judge Kaplan didn't get it. He told the jury this was not a contract about plain, everyday language, and then he informed the jury about the regulatory definitions. So he was instructing them on the specialized definitions, but not the main part. I do want to go back, though, to the first issue just for a minute, because I think what's so odd about the case is this court held in Dish that if you're holding up a specialized definition, in the four corners of the contract, you have to show that the parties incorporated it. Dish was at summary judgment. And this court said as a matter of law, if there's no language in the contract that picks up the specialized definition, then we just look at ordinary meaning under New York law. Well, what about the sub license? And so once Judge Kaplan correctly says you didn't pick up the tax definition in the contract, there are no longer reasonable competing interpretations to generate ambiguity. The tax definition is correctly off the table as a matter of law. I understand. And the only thing left is ordinary meaning. Well, if we're right about that, Judge Wesley, then we're right that malt beverages and beer never should have gone to the jury. Those terms weren't ambiguous. At a minimum, we'd get a new trial. Well, let's see if I want to make sure I understand. Then you're saying the definition of beer that appears in J2105 in the sub license is not on the table? So, no, that definition is what's being interpreted. Beer means beer, ale, porter, stout, malt beverages, and any other versions or combinations of the foregoing, including non-alcoholic versions of any of the foregoing. That's right, and those terms are themselves not defined. So what we said to Judge Kaplan was, they take their ordinary meaning under New York law. And what Constellation said was, no, beer picks up a tax definition which is broader. It can include things like sake and things that are made with a sugar base rather than a malt base. And we said under DISH, no, if you want to point to a specialized definition, you have to have evidence in the four corners of the contract that you adopted it. And Judge Kaplan said that's exactly right, and he denied summary judgment on that ground. Once he did that, there were no longer competing interpretations of beer in the mix. There's just ordinary meaning. The specialized definition is off the table. And then the only question of malt beverages and beer should have been off the table because ordinary meaning doesn't include these seltzers. But versions remains on the table. Versions, that's just what I was coming to. That's part of the entire clause here. That's absolutely right, and that's why so much of the argument below is putting in versions. The trick about versions is it says any other versions. So what it signals is that it has listed beer as an example of a malt beverage, but you can pick up other types of malt beverages. And it has ale, porter, and stout. And then it says any other versions. So you can pick up things like lager and pilsner. If you hadn't done that, you'd be subject to an expressio unius. Somebody would walk in and say- This is a big contract. It was negotiated and constructed in the context of Modelo having to withdraw from the market in the United States, and it was also constructed in the context of a prior history of dealing between Constellation and Modelo with regard to Crown, right, the joint venture? Yes. Okay. So Constellation had been selling Modelo products in the United States for a period of time, pursuant to the joint venture. And then what happens is that when Modelo is bought out by Anheuser-Busch, ABI, that Modelo has to completely remove itself from the U.S. market. And the trial seems to reflect or the theories seem to reflect that. What happened was justice wasn't going to be satisfied with just Modelo supplying product to Constellation. They didn't want – Modelo would have any ability to turn on or turn off the spigot. They were still concerned about its effect upon the marketplace. And so what happened was a sale of the business. The production facility, the technology, everything. They bought Modelo's U.S. beer business, right? Yes. And that's what the sublicense is – I mean the sublicense is a part of that and the TSA is a part of that. Judge, I couldn't say it better than you did. They bought the U.S. beer business. Isn't it important to understand the terms and the context of that transaction? Yes. And in the context of that transaction, it was beer and the slightly broader category of malt beverages, and that's it. That's the outer bound. But did that – did that not – that agreement also allow and specifically provide for innovation on the part of Constellation? Yes, and I think those provisions are extremely helpful to us. I would – I'd urge the court to rely on – there's two – think about what the businesses are concerned about. Modelo is concerned that it's still selling Corona in other places like Mexico. Sure. But – Right, and so they're concerned about quality control. Sure. So, in fact, you have very specific language in the agreement about not interfering with the yeast and everything else. Right, and Constellation's concern from the other side is it wants to be able to innovate. And so they come up with these two provisions. And the one in Article 3, 3.3, says, well, you can substitute, right, as long as a reasonably qualified brewmaster would say you're not affecting the end product, so you don't harm our brand by changing the recipes for beer in the United States in a way that hurts Corona and the Modelo brand. And from their side, they say we want to make new beer products. And 2.15 says, sure, you can substitute existing ingredients and have brand extension beers, capital B, all back to the definition of beer. So the question is, is it a beer or a malt beverage? And, Judge Wesley, taking a step back, what happened here is you're exactly right. This was a beer business. And they divested it. And that worked fine for a while. And then they tried to make a malt-based seltzer. It didn't taste very good. That's why virtually all seltzers on the market have a sugar base. They originally, their legal department said, we can't do it. And then when they couldn't make the malt seltzer, they came back and said, all right, we're changing our legal opinion. We think you can do it. We think the contract incorporates this tax definition. Go with the sugar-based seltzer. And what happened was nobody foresaw the explosion in the hard seltzer market. It became a thing. They didn't want to just make a hard seltzer. They wanted to make it and put the Corona label on it so they could compete in the market. They tried to shoehorn it into a contract that doesn't say anything about non-malt beverages. And all of this sense has been a lot of rigmarole over what should have been a pretty easy case. The contract says beer and malt beverages. This is not a beer or a malt beverage. What happened with the trademark issue? I'm sorry. Was that also a trademark component of this? That is this case, Judge Lloyd. This is the contract. We sued saying you're infringing our trademark because you're putting our trademark on things that are not covered by the sublicense. So that is this case. So help me out here. Where it says including non-alcoholic versions of any of the foregoing. I'm not a real drinker, so you're going to have to educate me. But I am familiar with non-alcoholic beers. What non-alcoholic versions of any of the foregoing are we talking about? Does that include because there's an argument about root beer and so on? We would say no. The root beer, ginger beer, is not the meaning of beer in this contract. It means beer like High Life and Bud. And so what we said below was when it includes non-alcoholic versions, I think non-alcoholic beers actually have a little bit of alcohol in them. So you could argue they're covered already as types of beer. They have half percent. They have half percent, very low. But the parties said, look, that's at the border. We could debate whether non-alcoholic versions come in. So we'll specify that. We'll put non-alcoholic versions in there. And that's it. That's the outer bound. And what they want to do, Judge Loyer, is say, ah, well, we wouldn't normally think of a non-alcoholic beer as a beer. So if they included that, well, Nelly bar the door. They must have meant by beer something far broader than the ordinary meaning. And it pulls in hard seltzers. And I don't think that is a reasonable way to read the contract. It expressly calls out the border case, which would be debatable. And I don't see how you get from that to something that lacks two of the defining characteristics of beer in malt and hops. It doesn't look, smell, or taste like a beer. It puts you in a tough spot. Because when you say that Zima is a beer because it's malt-based, it's about as much a beer as a Cadillac is a Volkswagen. I 100% agree, Judge Weiss. They're really cars, but they're hellaciously different. I want to be really clear, and I'm sorry if our brief didn't make this clear. Big B is the term in the contract. But the undefined terms in that definition are beer, small B, and malt beverages. Zima is not a beer, small B. Zima is a malt beverage. I didn't realize that until this case. But it has malt in it. So does Mike's Hard Lemonade. Those are within the contract by virtue of being malt beverages. They are not beers. They are not little B beer. And that was our whole pitch to Judge Kaplan below. Well, see, your ordinary meeting argument belies that difficulty. I mean, your ordinary meeting argument is directed towards a glass with golden in color and a frothy top. I mean, that's what the common person understands beer to be. This is a different case from that. It's trying to understand what the parameters were of the beverages that you were willing to allow to bear the Mondello mark that wasn't your product with someone else's, right, in the United States. Yes, but I think, Judge Wesley, I'm agreeing with everything you're saying. We're just coming at it a different place. I think of this as no different from lots of ordinary contractual terms. If you had the term sport in a contract and it said sport means baseball, football, basketball, and any other versions or combinations of sports, I don't think we'd have any ambiguity between the two of us about what's a sport, baseball, softball, sure, all the rest. But would we say that, like, a card game is a sport? I don't think we would. And that's basically what happened here. Beer and malt beverages have certain characteristics. A malt beverage is broader than little B beer. It is, right? It includes Zima. It includes Mike's Hard Lemonade. But that's the outer bound. You've got to have malt. Well, I've got two questions. First about that clause, the definition of Big B, capital B beer. Why, if you're right, why add any other versions or combinations of the foregoing? Because that would be covered by, you know, it means beer, ale, porter, stout, malt beverages. If that's clear, then any subset of that isn't necessarily that. So why add any other versions? What work does that extra language do? And just to go back to non-alcoholic versions, maybe I understand that a little bit better, but why any other versions or combinations of the foregoing? So, Judge O'Leary, I take the point that there's superfluity on either view, because once you say malt beverages, superfluity, because once you say malt beverages, beer has malt in it. Once you say beer, why say ale, porter, and stout? As Judge Wesley says, it's a carryover from a previous contract. But what the versions language is doing is it's guarding against expressio unius. If you said beer, ale, porter, stout, I guarantee you somebody would jump up and say, oh, it's just ale, porter, stout. It's not lager, pilsner. It's not IPA and the rest. And the any other version says, okay, we've listed a certain kind of malt beverage in beer, and we've listed certain types of beer in ale, porter, and stout, but we want any other versions of those two things. And that leaves them room to innovate, and so they did. They've made malt drinks, new malt drinks, like Corona Refresca that has malt in it, and we've never objected. Malt beverages, Judge Wesley, is broader than little B beer. They can make all the malt drinks they want, and we can't do a thing about it. But once they got to non-malt drinks, they crossed the contractual line, and that's when they started using our trademark in ways that no one contemplated when we divested a beer business. Now, I grant that malt beverage is a little broader than beer. It gives them the ability to make some things that don't look like beer. But what it doesn't give them the ability to do as a matter of plain, unambiguous contractual text is make non-malt drinks. When they say at page 43 of their brief, Judge Wesley, that a version of an original doesn't have to keep the defining characteristics, I just think that's gobbledygook. If you get rid of the defining characteristics, it's no longer a version of the thing. If they make a beverage without malt, it's no longer a version of a malt beverage. If it doesn't have malt and hops, it's no longer a version of a beer. It may be something else. It may be some similar kind of drink. It has some of the other same ingredients. But it doesn't look, smell, taste like a beer. It doesn't have the color of beer. It doesn't get a foamy head when you pour it. It doesn't have the mouthfeel of beer. These drinks, they're welcome to make them. They just can't put our label on them because they are not little B beer, ordinary meaning, or malt beverages, ordinary meaning, and it's as simple as that. Judge Kubanis, do you have any questions? No. Let me just ask one question. It's a little bit of a follow-up to what Judge Wesley asked. Let's assume, and this is going to be a big assumption for you, Mr. Wong, I appreciate it, but let's assume that there were no alleged errors with respect to the jury instruction and so on during the trial. And the jury determined that whatever ambiguities existed, they read the definition of beer in the way that the appellee wants us to read it as including hard seltzer. So let's assume that. What would we make of that finding by a jury after Judge Kaplan has determined that the term is ambiguous and is subject to different plausible readings? Right. I mean, it seems to me, and this is my difficulty and you might be able to help me out, that we have a jury that not only says, you know, understands that this has been viewed as ambiguous, but then with all of the evidence, and I understand that you've got some objections, but with all this evidence in front of it and just, frankly, at the end of the day, the words on 2105, it finds that affirmatively that the definition of beer, capital B beer, includes this product that you say reflects a trademark violation. So, Your Honor, in a sense you're asking me to fight with one hand behind my back. It's a big ask. Well, here's the thing, right? I understand I'm fighting uphill against jury verdict. If you say how did the jury reach this sort of somewhat counterintuitive result, the first thing I'm going to say is I don't think that the jury was instructed properly and I could walk through why I think they were misled. Once you take off the table the jury instructions and the third issue on the evidence that was excluded, if we just assume that Judge Kaplan got all that right, then really we are just at the first issue. We're just saying it never should have gone to the jury. If the jury took my earlier contract on sports and came back and said, you know, pinochle or playing uno is a sport, I'd be here saying that, sure, the jury found that, but that question never should have been put to them because this contract is not genuinely ambiguous. And you still have your Morse diesel issue. My Morse diesel. But I will say, Judge Lowy, it's more important than just this case because Dish says at summary judgment if you can't point to a specialized definition in the four corners of the contract, that's off the table and you're looking for ordinary meaning. And that's a legal ruling. That's a matter of law, right? Once Judge Kaplan gets that right, that their tax definition is not incorporated in this contract, it's different words from the tax regulation, then there isn't a competing interpretation that's reasonable to stack up against ordinary meaning. And then it's just a question of are we right about ordinary meaning or is the ordinary meaning of these words genuinely ambiguous? And, Judge Lowy, if I'm wrong, if when people say the word beer to each other, that doesn't carry an ordinary meaning, then it should have gone to the jury. And if you take issues two and three off the table, we lose. The whole submission is that does have an ordinary meaning across dictionaries and in common usage. We know what we mean when we say a malt beverage or a beer. And if we give those words the ordinary meaning, every time I explain this case to somebody who's not a lawyer, they have the immediate reaction of, well, it's not a beer. Does it have malt in it? No. Everybody agrees it doesn't have malt. Then it's not a malt beverage. I don't understand what you're debating. So I agree with you, Judge Wesley. It feels to me like sort of the kind of case that only lawyers could debate. I just feel like that indicates that the court ought to reverse, not affirm. This never should have gone to the jury. It's not ambiguous what these parties meant by the kind of drinks that they could put our labels on. All right. So we have reserved some time for rebuttal. We'll hear from Ms. Goldstein. Thank you. Thank you. Thank you. May it please the court. Sandra Goldstein, Kirkland & Ellis for Constellation. As Judge Wesley said, it is undisputed. This license goes beyond yellow healthy beer. Zima, Mike's Hard Lemonade, we can make. That's capital V beer. They also concede. All apparently have malt. Those do have malt. Yes, Your Honor. Those do have malt. But they say we can make a hard seltzer. That's correct. They have malt, but there's no malt requirement in this contract. There's absolutely nothing in this contract that says that we are required to have malt. ABI says that this isn't licensed because it has to use malt in all of its innovations for the rest of time. But to succeed on summary judgment, ABI has to show that the contract is so clear on this point that no reasonable person can find against it. There's no reasonable way to conclude that we are right and they are wrong. But, of course, after a two-week jury trial before Judge Kaplan Would this include wine? It would not include wine. Why not? Well, first of all, we know for sure it would not include wine because it has to be brewed. And wine is not brewed. We're just saying it's got to be brewed? So that's in the definition. It excludes spirits in wine. It excludes spirits in 2.15c and it excludes wine in the definition of recipe. It has to be brewed. And that's the point. There's beer, there's wine, there's spirits. Right? This is beer. This was intended to be, this is a contract forever, and it was intended to be broad. It includes beer. And it doesn't include, like they say in their papers, orange juice and chocolate milk because it has to have yeast. Right? So it's not those kinds of drinks. It's not wine. It's not spirits. It's beer. And the seltzers that you're selling use the Modelo yeast that was covered under the sublicense that you bought and that you have and that you're required to use in a particular way. And you're responsible for not compromising with microbacterial agents, right? Exactly. And there's never been any allegation that we've done anything wrong in that regard. So exactly. Exactly. And if ABI's theory were correct, it would be virtually impossible for nine people, Judge Kaplan and eight jurors, to find against it, right? But that's exactly what happened in this case. The problem is the sublicense doesn't say anywhere. Well, step one is to go to the jury, there has to be a conclusion that there's an ambiguity. Correct. Correct. Because then it becomes a fact question as to the intent of the parties measuring it against the language that they employed and or the purpose of the agreement, the overall negotiation context, et cetera. Right. And there are many ambiguities here. First of all, as Your Honors pointed out, it says, any other versions. Even before we get there, it says, yeah, any other versions. Let's start with that, right? Any other. There are no two broader words, right? It says, this court says the Supreme Court, any other versions. Well, let me disagree with you a little bit. It says, any other versions or combinations of the foregoing. Correct. Correct. Well, the foregoing is beer, ale, porter, stout, malt beverages. Right. So a couple of answers to that. First of all, as you said earlier, it includes non-alcoholic. And that's important. I want to talk about that. Because the one thing that my friend's interpretation of beer, which we disagree with and we'll get to, but the one thing all of their dictionary definitions actually say is that it's an alcoholic beverage. So it has to be, unlike their interpretation, it has to be doing something more than just being beer or malt beverage. Because under their definition, beer is an alcoholic beverage. Every one. That is the one thing. That's why the provision, the clause, the definition of beer specifically refers to non-alcoholic versions. Well, it's beer, ale, porter, stout, or any other version, or any, including, first of all, it's including but not limited to. Yes. It says including, but there's a construction in 1.2, whatever it is. It's including but not limited to. So it's an example. But, no, the reason, actually, that, well, one of the reasons it says is, unlike, my friend here is wrong, the issue is not actually off the table as to whether this incorporated the IRC definition. As Judge Kaplan says in Special Appendix 12, there was an absolute question as to whether the intent of the parties was to incorporate that definition. Because think about it. Beer, ale, porter, stout is all part of the IRC definition. Malt beverages, they keep on talking about ordinary words. There is no ordinary term for malt beverage. There's no dictionary definition. Nobody says let's go to the bar and have a malt beverage. There is no term for malt beverage in English, you know, vernacular for the guy in the pub, which is their main argument. There is, however, under the FAA Act, a malt beverage. So beer, ale, porter, stout, first four words of the IRC, the federal definition for IRC beer, malt beverage, FAA, there's no superfluity. Again, contrary to what my friend said, there's no superfluity in our definition. But if it was an IRC beer, it couldn't be alcoholic. So that's one example. It's only one example. But versions, every word in that definition does something in the way we look at it. And frankly, the fact that we're sitting here and arguing whether it's superfluity. We say they're superfluous. They say there's belt and suspenders. Right there you have ambiguity that goes to the jury to decide what the intent of the parties actually was. So that's one area of ambiguity. And then all those provisions that talk about us being able to create entirely new recipes at our sole discretion, that we can substitute ingredients as long as it doesn't change the finished product, without ever saying malt. And then other provisions that talk about requiring yeast, that talk about not having spirits. The TSA provision that says the transition services agreement, that says they have to give us for three years malt, hops, yeast, and cornstarch. But under no circumstances does that apply to innovation. So if we're talking about constructions, what about the parallelism construction? You have ingredients being discussed. Yeast is in both of them. Yeast is in the sublicense agreement. Yeast is in the TSA. What's not in the sublicense agreement is malt and hops. So again, I think the jury also thought we're right. But at the very least, creates an ambiguity. And then we were talking about, and so it has to, well, sorry, back up for a second. Any other versions? Back to that for a second, right? So for sure, everybody concedes this is a beer under federal law. It is regulated. Corona hot seltzer is a beer, undisputed, under federal law. Well, sure, that's true. But I don't think that matters. You have a definition of beer in an agreement that you, a sophisticated party, had entered into. And so this is a licensing of a mark in conjunction with the purchase of an entire market. Forever, right. The United States of America.  Right. So sophisticated parties chose to use this definition. Right. Beer means beer, ale, porter, stout, or malt beverages. It isn't, I mean, you know, hindsight is always 20-20. You could have said beer means only malt beverages. But that's not. If you had said that, then it would be crystal clear, wouldn't it? No. It would be, your party would be a winner. For them. Yes, for them. But that's the point. It didn't. We believe this is beer. But at the very least, it has to, and again, Judge Kaplan sent that to the jury explicitly under Special Appendix 12, as reflected in Special Appendix 12. But we believe this is beer. But at the very least, how can it not be any other version of what the federal government regulates as beer every single day? And let's talk about any other version of malt beverage. Again, there is no term malt beverage in the. Did you argue that by understanding the federal definition, you then understood, quote, what the beer business is, end of quote? We definitely argued that the federal definition applied below. We certainly argued that. Again, the beer business is what's in the beer fridge, right? Just to go back to that, and then I'll get to any other versions of malt beverages. The beer business, this is all the beers, not wine, not spirits, not chocolate milk. It's what is going to be in that beer fridge in the bodega? What's going to be in that beer aisle in the store? And we, this is a contract in perpetuity. We need to be able to compete. ABI makes a malt-free beer. ABI makes a malt-free beer called Redbridge. Somehow, that's a beer. Ours is not. ABI makes a gluten-free hard seltzer that they put out there and market under their iconic brand, Bud. It's Bud Light Seltzer. They can. We can't. That's the point. We need to be able to compete. And might there be questions down the road as to a product that's closer to the line? Maybe. This one's not close to the line, but in any event, it's not for the court to decide as a matter of law. It's hardly surprising with a perpetual contract that there may be a dispute or two. But this one's not close to the line. Educate me again. Sure. Was hard seltzer in 2013 a major part of any liquor business? It was not what the discussion was, but Zima and Mike's Hard Lemonade were. So there was definitely discussion around we need to be able to make that kind of drink. But there's this very ingredient light. So the word seltzer or the term seltzer was part of the background and was one of those things that would have been put in the beer section back then in 2013 in the bodega? Yes. Yes. So if that's true, and I'm just asking questions. Don't draw any conclusions from my questions, but you're here to educate me. If that's true, then why not include seltzer somewhere in this contract? Because, again, the real reason is beer, ale, porter, stout is one part of the definition. It is the IRC beer. More beverage is the other. We didn't include Mike's Hard Lemonade either. I'm not absolutely sure. I'm not sure there wasn't. I'm sorry. Elsewhere, I didn't realize, because I've been looking for wine, but the contract excludes wine and spirits. Right. Correct. And I may have misunderstood your question before. I do not believe hard seltzers existed as of 2013. The fruity drinks did, but literally hard seltzers did not exist as of 2013. 2018, right? I believe around that, correct. I'm sorry. They were created in 2018? Certainly they were not. They did not exist as of 2013. I'm not exactly sure of the timing. Well, the briefs talk about the hard seltzer market exploding in 2018. Okay. Yes. So I'm focused on the word exploding as opposed to existing. Right. I'm not sure they existed in 2018. Okay. So we don't know. Yeah. I don't think they did. And I want to just make sure everybody understands the Corona hard seltzer is labeled beer. We're not just sort of calling it a beer. It is labeled beer on the side of every can. And, but I want to get back to the, it's not only a version of a beer, right? It's also a version of a malt beverage. Because. Oh, I thought you were picking up a beer there. Soon, soon. Give me a couple of minutes. You won't be alone. Okay. I'll share, I promise. It's also a version of a malt beverage because everybody agrees in this case. All the experts, all their expert reports, Shellhammer, Daniels, everybody agrees that the products are made the same way. Right. They say we can make a hard seltzer as long as it has malt in it. Right. Everybody agrees that whether you use malt or you use sugar, either way creates a mutual base of a light drink. And then you add flavor. Right. And remember, any other substitutes, you could substitute any other ingredient in 3.3. So I think we win there, too. But beyond that, everybody agrees that they're the same product. Right. And all this is is a gluten-free version. Right. There's dairy-free cheese these days and dairy-free ice cream. This is a gluten-free version of the beverage they say we can make. Their response to that? Their response to that is, well, but if you want to make something gluten-free, you could use rice or sorghum. Right. Don't use sugar. You could use rice or sorghum. Well, what's fascinating about that answer is if you look at SPA-30, which is the materials for production of beer under federal law, it says beer must be brewed from malt or from substitutes for malt. Only rice, grain of any kind, bran, glucose, sugar, and molasses are substitutes for malt. So rice is one thing they think we could use. Sorghum is a grain of any kind. So it lists rice, sorghum, sugar are substitutes for malt. And somehow they've concluded that we can use rice and sorghum, which are substitutes for malt, not malt, substitutes for malt, but we can't use sugar. Where is that in the agreement? They're just making this up. Thank you very much. Thank you very much. This is Walt. Just a handful of quick points. First, two quick factual corrections. I don't think there's any evidence in the record that these seltzers used the Modelo yeast that was being used in beers at the time of the divestment. It would be very odd if they did. Council referred to Redbridge. That is a gluten-free sorghum beer. There is not evidence in the record about whether that sorghum is malted. There is no evidence in this record that there is some commercially available beer that does not contain a malted grain, but setting those to the side. First quick point is they say at page 39 of their brief, a malt beverage is not defined by malt. If that's wrong, then under Morse Diesel, at a minimum, we get a new trial, because the jury got to consider malt beverages too. Turning to beer, the question is, is it ambiguous? Now, it's not like below, Judge Wesley, we were debating ordinary meaning. We walked in with ordinary meaning, dictionaries, common usage. They walked in with the tax definition that Ms. Goldstein keeps turning back to. Once the tax definition is off the table under Dish as a matter of law, that doesn't mean it's a jury question post-Dish. Dish didn't remand for trial on that. It means if you don't show the specialized definition in the four corners of the document, you don't have anything to trump ordinary meaning. There aren't competing reasonable interpretations. So- Am I correct that what you're pinning your argument to, then, is that within the sub-license, the group of identified beverages being porter, stout, etc., beer being one of them, that you are pinning your argument to the ordinary meaning of small b beer? Absolutely. Ordinary meaning of small b beer, ordinary meaning of malt beverages. If you walked outside this courtroom and you asked anybody what a beer is, they'd tell you it's an alcoholic drink with malted grain and hops. If you asked them what a malt beverage is, they'd tell you it's a liquid drink with malt. That is our case. But you accept the fact that they'll be non-alcoholic because the definition goes on, goes past that. So the contract doesn't rise or fall. I mean, the contract has more than just the ordinary definition of beer within the definitional context. Absolutely right. It expanded beyond little b beer to malt beverages. So let me ask you, is the ambiguity at the word beer or at the general definition of beer with a capital B? So they say the ambiguity is at the level of little b beer because they say, oh, there's this tax definition, too, and it includes things like sake. On its face, the tax definition calls out sake. And where do you say the plain language is? We say the plain language is at little b beer and malt beverages. Beer has an ordinary meaning. If beer is like the word broadcasting a dish, if it has an ordinary meaning to everyday Americans, once the specialized definition is off the table as a matter of law, if we're right that that word has an ordinary meaning, then we win. And what I was trying to make the point, Judge Wesley, is in some of these cases, everybody's debating what the ordinary meaning is. But it's not like in their brief to this court they came into you and said, oh, they think ordinary meaning of beer is one thing. We think it's another. When people use the term, they don't mean a malty, hoppy drink. They mean something else. We're not debating ordinary meaning. They've never contested us on that battleground. They've always been pointing to the tax definition. And our point is that picks up a lot of things on its face, like sake, that nobody thinks are beer. And I don't understand, Judge Wesley, how else they should have written this contract. If you'd been sitting there in the room and you'd said – Did they also cross move for summary judgment? We did. There were cross motions for summary judgment. So they must have moved based on some meaning. And I guess you're saying it was just the regulatory meaning? They moved for summary judgment on the tax definition. And Judge Kaplan said, no, no, I'm denying that under DISH. And we said ordinary meaning. And he denied that, saying it was ambiguous but didn't specify why. And it all went to the jury. And their whole strategy all along, and you saw the same thing in argument, is just to kick up a lot of dust about versions and various things and to say, well, gosh, it has to be ambiguous. We got a jury verdict, didn't we? And this goes back to my question, Mr. Wall, which is that if you are right about beer and malt beverages, and that's what I understood to be your fundamental argument, and you've been very clear about that, and this also ties into your Morse diesel argument, but that is not the full definition of capital B beer. There's the any other version. So why would the parties add that? And, of course, there was this extrinsic evidence about some colloquy between lawyers relating to the applicability of the IRC. And its definition of beer. So there's all this background that came out of trial that I appreciate. But we're not just at beer and malt beverages. It's sort of like saying here's the definition of unicorn and any other versions of the unicorn. What is that? So two different points. I totally agree. If we're right about any of these things, like even just malt beverage, if we're right that this is not a malt beverage because it doesn't contain malt, then under Morse diesel shouldn't have gone to the jury. But you're right, Judge LaLea, to get reversal, not just a new trial. We need to be right that it's unambiguous malt beverage. Beer is unambiguous, has an ordinary meaning to everyday Americans, pops up in every dictionary you look at, and we have to be right about versions, too. And my point on versions is if you look at the text, it says any other versions. So it makes clear that what it's doing is talking about other types that aren't listed, ale port or stout, but other versions, too, to guard against the expressi lunis. And if you look at it, Your Honor, and you try to ask, well, which of two things could it have been doing? Was it meant to cover all the unlisted forms of beer and malt beverage? Or was it meant to sweep in things that no ordinary American, no ordinary contracting party would ever have thought were beer or malt beverage? I think it has to be the former rather than the latter. It's the only sensible interpretation of the words. But I will say, even if you thought that that versions language gave them some room to experiment, surely you have to end up with a product, and the contract says this, it says brand extension beers. You have to end up with a product that's recognizable as beer. And here, by dropping the malt and hops, you end up with a product that doesn't look, smell, feel, taste anything like beer. And I think that's where this case went wrong in the district court. There was not genuine ambiguity about the ordinary meeting. I understand that because we went to a jury, they have a verdict, and now they can say, must have been ambiguous. But I don't think it was ambiguous. And I don't want to surrender Judge Loehr. No, no. They could also say, must have been unambiguous in our favor. Well, but I think the reason the jury came out where it did, I don't want to surrender the jury instructions argument. Because it really was that Judge Kaplan told the jury about the regulatory definition, the tax definition. And we said, well, then at least tell them that the New York contract law principle is ordinary meeting unless the parties intend something more specialized. And Judge Kaplan said, I don't disagree with that, but I'm not going to give that instruction. And as a result- Well, he told them that they could understand the language as they use it. That's right. So he didn't deny the ordinary meeting. He took the position that he had already given an instruction that was adequate to satisfy. Well, I think what he- So I didn't really see, I mean, I read his, I have it with me again, because I read it page for page. I didn't take it to be a repudiation of ordinary meeting. I took it to be that he felt that he had already kind of instructed the jury to read the language and they were allowed to use their own understanding of language, English is English, to interpret the language that the parties had used. But then said, but you also have to look at the entire agreement. You have to look at the structure of the agreement and what the parties were about. So it's fair for you to consider the context in which the parties negotiated this agreement. And that seems to be, to my understanding of New York contract law, correct interpretation when there is an ambiguity. So it's a fair amendment, Judge Wesley, but I think here's why it was misleading as a whole. I don't think it was wrong to tell the jury you have to look at the words of the contract. That's clearly right. And it's not wrong to say you can define zebra as three pieces of furniture. That's not wrong either. But here, what we're dealing, it's a definition that didn't define the term in some unusual way. It just has beer and malt beverage. I mean, consider this, I know Judge Kaplan, I have a great deal of respect for him, but I'm not necessarily defending his position here. But Kaplan's got a case in which you've already said zebra is a beer. I mean, with all due respect, that's, I mean, if I was the trial judge, I'd say, are you kidding me? Because it's fruity and it's clear and it's carbonated. But, Judge Wesley, we've got to be careful about the big B and the little b. I understand. Well, that's why he said zebra is capital Z and has this unusual definition that you might not necessarily appreciate. And here's why. And so I agree with everything up to that point that you just said. And then here's where I think it went wrong. Okay. He then instructed the jury on the regulatory definition, the tax definition. I know that. And we said, well, then tell them our side of it, which is the ordinary meaning side of it. And they said at the charge conference, wait a minute, that's going to confuse the jury, right? That's going to conflict with our regulatory definition. And he took that off the table. We couldn't introduce dictionaries, and the jury was told to disregard the one reference it heard. With regard to the refusal to involve the ordinary, you offered 13 definitions of beer, and you don't accept a single one in your brief. Now, that's a fair statement, isn't it? I don't think- Your brief says nothing, with all due respect, counsel, to the fact that you offered 13 definitions and Kaplan said no, and you don't ascribe beer to that. We're not challenging the evidentiary ruling on not letting in the dictionary definitions, because that wouldn't solve the problem. Because the jury instructions didn't inform the jury to go look at ordinary meaning. That's what we think the problem was. With all due respect, you're here talking plain language the whole time, and yet you don't ascribe air to the judge's refusal to use the dictionary definition, which most people would understand to be the ordinary understanding of a term. I agree with you. We do think that evidentiary ruling was wrong. Don't tell me it was wrong when you don't raise it as air. But we don't think it would have solved the problem, because the problem was the jury instruction telling the jury to disregard the one dictionary definition they heard and telling them about the regulatory definition and not ordinary meaning. Even if he had let in the dictionary definitions and I were just here arguing over that, I think the court would say, well, wait a minute, you don't think that's the real problem. You think really the jury came out that way because they weren't told to look at ordinary meaning. And that's why we frame the challenge in terms of the jury instructions and the dictionary definitions, because I don't really think it's an evidentiary problem. I think it was that the jury wasn't correctly told the ground rules. But my hope is that the court doesn't get to that, because it sees that on the face of the contract, this question never should have gone to a jury. Your first argument is a semi-judgment argument. That's right. We weren't debating ordinary meaning. Thank you very much, both of you. Well, brief, do we reserve the decision?